ANACONDA COPPER MINING CO., Appellant, *v.*
HEINZE et al., Respondents.

(No. 1,706.)

(Submitted January 23, 1902.   Decided August 2, 1902.)

*Mines and Mining—Ore Vein—Ownership—Burden of Proof
—Injunction—Equitable Title—Evidence — Rebuttal—Appeal—Rules of Trial Court.*

1. In an action to restrain defendants, who are engaged in removing ores
   from beneath the surface of plaintiff's ground, the burden is on defendants
   to show that they are not trespassers, and that they have a right to follow
   the vein into plaintiff's territory ; and in case of doubt an injunction should
   be granted.

2. Where, on an application for an injunction, affidavits offered by defendants
   were received over plaintiff's objection that copies had not been served on
   his counsel, as required by the rules of the district court, and the record
   does not show the provisions of such rule, the supreme court is unable to
   say whether the ruling was erroneous.

3. On an application for injunction to restrain defendants from removing
   ores from plaintiff's ground, the court cannot consider the evidence in an-
   other action involving the title to the same vein, but to which this plain-
   tiff was not a party, or interested, either where such evidence is embraced
   in affidavits or on the court's own recollection thereof.

4. Under Civil Code, Secs. 1012, 1013, providing that the trustees or officers
   of any mining corporation shall not have power to sell any part of the
   mining ground unless the sale is first authorized by a vote of two-thirds
   of all the stockholders at a meeting called for that purpose at which three-
   fourths of the stock is represented, a proposition by the president that on
   deposit of a specified sum as the purchase price the corporation will at
   once proceed to obtain the requisite consent of its stockholders for selling,
   and will then sell and convey a specified portion of its mining claim, and
   the acceptance of such proposition and deposit of the money, do not give
   the proposed purchaser an equitable title to the mine, or right to extract
   ore therefrom.

5. Where, in an action to restrain defendants from taking ore from beneath
   the surface of plaintiff's ground, defendants had introduced evidence that
   the apex of the vein was in their ground, and that it could be traced to
   the point where they were working, evidence by plaintiff tending to show
   that the vein was not continuous was proper rebuttal.

6. Where, on a motion for an injunction to restrain defendants from taking
   ore from beneath the surface of plaintiff's ground, the court has received
   incompetent evidence for defendants, and excluded material evidence offered
   by plaintiff, and it is reasonably apparent that the court was influenced
   thereby in denying the motion, the order will be reversed, even though the
   competent evidence received was sufficient to sustain the order.

Vol. XXVII—11

*Appeal from District Court, Silver Bow County; William Clancy, Judge.*

ACTION by the Anaconda Copper Mining Company against F. Augustus Heinze and others. From an order denying a temporary injunction, plaintiff appeals. Reversed.

*Mr. W. W. Dixon, Mr. A. J. Shores, Mr. C. F. Kelly,* and *Mr. D. Gay Stivers,* for Appellant.

*Messrs. McHatton & Cotter,* and *Mr. James M. Denny,* for Respondents.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

Action in ejectment and for damages, in which plaintiff seeks to recover possession of the Snow Bird quartz lode mining claim, situate in Silver Bow county, and the value of ores removed therefrom by the defendants. Equitable relief by way of injunction is also sought to restrain removal of ores pending the action, and perpetually, in case plaintiff succeeds in obtaining judgment.

Upon filing the complaint the plaintiff applied for and obtained an order requiring the defendants to show cause why they should not be enjoined pending the action. They appeared and filed a joint answer, and, after denying that they were guilty of trespassing upon the property, set up an equitable counterclaim, by which they seek to obtain a decree adjudging the defendant F. Augustus Heinze the owner of it under a contract by which he purchased it from the plaintiff, with other property, for the price of $100,000, which has been fully paid. After a hearing the temporary injunction was denied. The plaintiff has appealed.

The subjoined diagrams will serve to illustrate the contentions of the parties.

DIAGRAM NO. 1

DIAGRAM NO. 2

The main controversy at the hearing turned upon the question where the apex of the vein in which certain ore bodies are found is situated,—whether within the boundaries of the Snow Bird claim, or within those of the Johnstown and Rarus claims to the north, which belong to the defendants, the Johnstown Mining Company and the Montana Ore Purchasing Company. The plaintiff contended that the apex of a vein, known as the "Windlass Vein," passes through the northeastern portion of the Pennsylvania claim in the direction indicated by the words "Windlass Vein" upon diagram 1, and that this apex is also found within the perpendicular planes descending into the earth through the exterior boundaries of the Snow Bird claim.

The Snow Bird is a fractional claim, and a portion of it shown on diagram 1 is indicated by the letters G, H, K, L, M. Portions of the Johnstown and Rarus claims to the north are indicated by the letters G, C, D, I, K. The Pennsylvania, to the south, belongs to the Boston & Montana Consolidated Copper & Silver Mining Company. The lines AA and BB represent, substantially, parallel fault fissures extending through the country in a northeasterly and southwesterly direction, and dipping into the earth at an angle of about 50 degrees toward the northwest. Under the theory advanced by the plaintiff the fault occasioned by geological disturbances in the crust of the earth was attended by such a movement of the portion between the fissures as to cut off and destroy the identity and continuity of the vein to the east and west, and the Windlass vein, having its apex near the surface toward the east end line of the Pennsylvania, is cut off by the fault so that its top or apex descends into the earth under the face of the east fault fissure until it passes through the north side line of that claim into the Snow Bird, thus presenting what plaintiff claims is a subfault apex within the boundaries of the latter. AA represents the face of the east fault near the 900-foot level of the Rarus workings; BB the face of the west fault at or near the 1,000-foot level. The vein, as it descends under the east fault fissure, enters the Snow Bird ground across the line HI between the 800 and 900-foot levels, and, traversing the claim under the dip of the fault,

passes into the Johnstown across the line GK about the 1,000-foot level. The plaintiff's witnesses state that the vein is practically vertical. Let us suppose a plane passed downward through the earth in the direction of the strike and along the southeast wall of the vein fissure, and the portion of the earth toward the southwest removed. To a person facing the northeast the vein would be exposed with the various levels ending at the east fault fissure represented by the line CE on diagram 2. This is the line of the subfault apex as contended for by the plaintiff, and, if its theory is correct, it is entitled to the portion of the vein intercepted by a plane passing through the line CE (AA, diagram 1) on the strike and dip of the fault, and perpendicular planes passing downward into the earth through the lines GK and HI (diagram 1). The plaintiff introduced evidence tending to sustain this contention.

The defendants contended, and produced evidence tending to show, that the so-called "Windlass Vein" has no existence in fact; that there is a vein the top or apex of which is found in the Johnstown and Rarus claims; that the vein dips to the south or southeast, and in its descent into the earth passes beyond the boundaries of these claims through the Snow Bird and into the Pennsylvania claim; that it has been so developed as to demonstrate its continuity from its apex to the ore bodies in question; and that the apex of the vein being so situated with reference to the end lines of the Johnstown and Rarus claims as to give extralateral rights thereon, the ore bodies belong to the defendant corporations by virtue of their ownership of the apex. While admitting that the fault runs through the country as plaintiff claims, they also produced evidence tending to show that it does not so interrupt the vein as to destroy its continuity and identity along its strike, but that it can be readily traced entirely through the fault by substantially continuous ore bodies of a character and composition identical with that on either side of it. There is no controversy but that defendants are entitled to follow the vein which has its apex on their claim; so that, if their contention as to its identity and continuity upon the dip and strike

through the fault is well founded, they are the owners of the ores in dispute.

1.    The contention is made in this court that, it being made to appear that the defendants were at the time of the hearing engaged in removing ores from beneath the surface of the plaintiff's ground, the burden was upon them to show that they are not trespassers, and that the evidence produced by them was not sufficient to warrant a refusal of the injunction.    As the order must be reversed upon other grounds, we shall not now undertake to decide where the preponderance of the evidence is, but leave the whole matter to the discretion of the district court upon the evidence which the parties may produce at another hearing.    We agree with the contention of the plaintiff, however, that in such cases the burden rests upon the defendant to show that he is not a trespasser, but that he possesses a title which justifies an intrusion upon the territory of his neighbor; and, unless the evidence is reasonably clear and satisfactory that the defendant is in the right, the injunction should be granted. In such cases the doubt, if any, should always be resolved in favor of granting the writ; but granting or refusing it is so much a matter of discretion in the trial court that this court will not interfere unless there has been a manifest abuse of discretion.

2.    The defendants filed in support of their contention the affidavits of George H. Robinson and others.    Objection was made to them on the ground that copies of them had not been served upon counsel for plaintiff, as required by the rules of the district court.    The objection was overruled, counsel excepting. It does not appear from the record what are the provisions of the rule upon which counsel rely.    We are therefore unable to say whether the ruling was erroneous.

3.    The affidavit of Robinson was devoted mainly to a history of a certain cause heretofore tried and determined in the district court of Silver Bow county, in which there was an issue between the defendants in this cause and the Boston & Montana Consolidated Copper & Silver Mining Company as to the ownership of the vein in controversy in this action, the cause men-

tioned being designated on the calendar of the district court as "Cause No. 7,337." Judgment therein was for the defendants in this action. The plaintiff herein was not a party to the action. The findings and judgment of the court therein are referred to in the affidavit of Robinson, and made a part of it as fully as if set out therein. The other affidavits contained similar, though not such extended, references to the same matter. Objection was made to this evidence on the ground of its incompetency. The objection was overruled.

Counsel for the defendants undertake to justify this ruling of the court upon the theory that the references made to cause 7,337 and the result therein served to enlighten the court as to the issue in this cause, and furnished aid to a proper determination of the respective rights of the parties. The matter was put in the form of affidavits, counsel say, in order to avoid the necessity of "having to present, as was the case in said cause No. 7,337, ten volumes, comprising about 6,000 pages, of testimony." As we understand counsel, the affidavits were introduced for the purpose of showing that the issue before the court was the same as that in cause 7,337, and that the evidence upon which defendants based their claim of title in that controversy was the same as that upon which they would have to rely in case they took the time and trouble to establish it in the present controversy. In other words, since the court had theretofore in another action, upon an issue of title between the defendant corporations and a stranger, heard a large amount of evidence, and had reached the conclusion that the said defendants were entitled to the ore bodies in controversy, and it would be inconvenient to go into the merits of the present case and establish title against the plaintiff, the plaintiff should be bound by hearsay statements or the court's recollection of the evidence adduced in the other action, and the judgment of the court thereon. It requires no argument to demonstrate the fallacy of this reasoning. The evidence was wholly incompetent as hearsay, and the findings and judgment of the court of no binding effect whatever, except upon the parties to that action and their privies. The plaintiff was not, upon the record before us, even

remotely interested in that controversy. Had the record in 7,337 been offered, instead of the affidavits, it should have been excluded as exhibiting a *res inter alios acta,* and of no evidentiary value whatever. The statements of the witnesses made at the hearing therein could, under no circumstances, be considered for any purpose in this case, except for impeachment, and then only after the attention of the particular witness testifying had been called to the contradictory statements then made. Nor was the court at liberty, upon its recollection of the evidence in that case, to consider it in determining the rights of the plaintiff, but was bound to hear only legal evidence, offered and admitted in the regular way at the hearing, and to reach a conclusion thereon without reference to what had theretofore appeared in other controversies touching the same subject matter between other parties. Knowledge of the issues to be tried is to be obtained from the allegations and contentions of the parties in the particular case, and not by reference to issues framed between other parties in other cases in the merits of which the parties whose rights are being tried have no interest.

4. To show equitable title to the Snow Bird claim in F. Augustus Heinze, the defendants offered, and there were admitted in evidence, certain telegrams, and a receipt for the sum of $100,000, the purchase price agreed to be paid by said Heinze for the claim, with other property, as the result of negotiations between him and J. B. Haggin, the president of the plaintiff during the year 1897. They are the following:

"New York, 10 September.

"Mr. Arthur P. Heinze:

"On deposit with the Anaconda Copper Mining Company of one hundred thousand dollars, said company will at once proceed to obtain the requisite consent of its stockholders for selling, and will then sell and convey, to F. A. Heinze, or his nominee, all its interest in the Sullivan claim, lot number two thirty-nine, and in and to the portion of the Snow Bird claim lying between the Pennsylvania, Rarus, and Johnstown claims, and east of the projection of the east end line of the St. Lawrence; and also assign any and all claims which it may have for dam-

ages for trespass on said mines to date of said deed. Said deposit to be applied to the payment of purchase money when deed is ready for delivery. Answer.

"J. B. Haggin, Prest."

"New York, 14 September.

"F. Aug. Heinze:

"That is not my proposition. Money must be deposited with the Anaconda Copper Mining Co. No delay will be necessary except the legal publication, as sufficient stockholders are represented here.

"J. B. Haggin."

"New York, September 16th, 1897.

"Received of Montana Ore Purchasing Company the sum of one hundred thousand dollars ($100,000)·for deposit in pursuance of telegram to Arthur P. Heinze, dated September·10th, 1897, of J. B. Haggin, president, for the purposes stated in said telegram.

"[Signed] J. B. Haggin, Prest."

It was shown by other evidence that negotiations for the purchase and sale had been pending for some time; that they had been conducted for the plaintiff by said Haggin; and that the receipt was for a deposit with Haggin for the company, pending consent of the stockholders, which Haggin undertook to secure. It was shown that the signature of Haggin to the receipt is genuine; but no other foundation was laid for the introduction of the telegrams, except that it was shown that they had been received in the usual way at the office of the Western Union Telegraph Company at Butte, and delivered to F. Augustus Heinze, or his brother, Arthur P. Heinze, who was acting for him, and that F. Augustus Heinze acted upon them in making the deposit. There was also evidence tending to show that the proposed sale for the company by Haggin had been enjoined at the suit of some of the stockholders, and·for that reason that it had not been consummated; also that the purchase price had been paid back to Heinze upon his depositing in its place $150,000 in first mortgage bonds of the Montana Ore Purchasing Company as security for the performance of

the contract on his part in case the necessary consent of the stockholders should be obtained, and that these bonds are still in the hands of Haggin.

For present purposes we shall assume, without deciding, that the reference in the receipt to the telegram of September 10th, and the oral evidence showing that the deposit was made in pursuance and as an acceptance of the proposition therein made, would have been sufficient preliminary proof to enable the court to admit and consider the telegrams and receipt as evidence in an action brought for the purpose of charging Haggin upon a contract made by him. It will be observed, however, that the proposition made was, not that the plaintiff would convey unconditionally, but that it would convey in case it could secure the necessary consent of the stockholders at a meeting to be held for that purpose, which the president would proceed to do. Under the provisions of law in force at the time these negotiations took place, the board of directors of a mining corporation organized under the laws of this state had no authority to sell, lease, mortgage, or otherwise dispose of its real estate, nor could the board confer such authority upon an agent, whether he was an officer or other person. Sections 492 and 493 of the Fifth Division of the Compiled Statutes of 1887, brought forward into Civil Code (Secs. 1012, 1013), are applicable, and require any such disposition of property to be authorized by consent of stockholders owning at least two-thirds of the shares of the capital stock at a meeting called and conducted as therein directed. Unless these provisions of law are observed, a sale, lease, mortgage or other disposition of the property could not be made.

It is apparent from the telegram of September 10th that Haggin claimed no authority to act for the corporation, for he expressly states that the corporation will obtain authority in case the deposit should be made. Therefore, while he might possibly be personally liable under his undertaking to answer in damages for failure or refusal to carry it out, he did not, nor could he, bind the corporation by any promise or undertaking whatever in its behalf. Had he made an agreement in the

name of the corporation, another question would be presented. As he did not, it is entirely clear that he did not, *prima facie,* bind the corporation, and there being no proof of authority in him to do so, the evidence offered to show equitable title was wholly incompetent. Why the security for the purchase price has been retained does not appear. The conveyance certainly ought to be made or this should be returned. But until the necessary authority is obtained by the board of directors, neither they nor the president can execute a conveyance, nor can a specific performance by the corporation itself be enforced.

5. The plaintiff offered to introduce evidence tending to rebut defendants' evidence in chief to the effect that the vein could be traced through the fault by means of continuous ore bodies identical in composition and character with those found to the east and west of the fault and of substantial commercial value. The evidence consisted of a number of assays from samples taken from the fault matter, and tended to support the contention of the plaintiff that the fault matter consisted of country rock, which contained no mineral except such as could be found in the country rock anywhere in that locality. Upon objection this was excluded on the ground that it was a part of the plaintiff's case in chief, and not proper rebuttal.

The plaintiff's theory was, as we have said, that a *prima facie* case for an injunction was made out by a showing that the defendants were engaged in removing ore from beneath the surface of the Snow Bird claim. This it attempted to do. After the defendants had gone fully into their evidence tending to establish title to the ore, basing their claim in part upon the identity and continuity of the vein through the fault matter, it was clearly competent for the plaintiff to rebut the evidence adduced in this behalf. It was, therefore, error to exclude the evidence offered, as it tended to fortify plaintiff's contention, and to rebut the claim of defendants. If, as defendants contend, the plaintiff had gone into this phase of the evidence in chief, it would ordinarily have been within the discretion of the court to exclude further evidence upon this point; but the record discloses that it had not done so.

6. It is said by defendants that, even though the court below did commit error in admitting and in excluding evidence, the order should not be reversed on that ground, if there is sufficient competent evidence in the record to justify the refusal of the injunction. They cite *Montana Ore Purchasing Co.* v. *Butte & Boston Consol. Mining Co.,* 25 Mont. 427, 65 Pac. 420. There is no doubt that this case states the general rule observed by this court in equity cases where it is reasonably apparent that the error committed in the admission or exclusion of the evidence has wrought no prejudice in the result. This rule, however, has no application where the error complained of is fundamental, and it is not reasonably apparent that it did not result in prejudice. If the evidence admitted or excluded is trifling, or unimportant, as compared with the competent evidence admitted and considered, and if its exclusion or admission could not have affected the result reached, the judgment or order appealed from will not be reversed on the ground of error in admitting or excluding it. Where, however, the evidence in question is of import, and by the ruling of the court thereon it is made reasonably apparent that it was so regarded by the court, and for that reason probably affected the result reached, the judgment or order based upon it cannot be sustained. The statement made in the case cited is not properly guarded, but it must be interpreted in the light of the conditions there presented. So interpreted, it is apparent that this court did not intend to lay down the broad declaration that a judgment or order made in an equity case will never be reversed upon appeal on the ground that the trial court has erred in admitting and excluding evidence. The intention was to follow, and not overturn, the rule correctly stated in *Merchants' Nat'l Bank* v. *Greenhood,* 16 Mont. 395, 41 Pac. 250, 851, which was cited in support of the view entertained of the evidence under consideration. In that case the evidence admitted was of doubtful relevancy and materiality. It was also trifling and unimportant, and could not have affected the result. In the present case the finding of the court may have been founded entirely upon the objectionable evidence, and, were it competent, such finding

would have been justified. If this had been excluded, and that admitted and considered which was improperly excluded, it is possible that the result would have been different. Under such circumstances the order must be reversed, and another hearing ordered.

Nothing said herein is to be understood as an intimation to the district court that upon another hearing, after considering all competent evidence offered by the parties, it should or should not issue an injunction; nor are we to be understood as having prejudged the alleged equitable title of defendant Heinze. Let the order be reversed, and the cause remanded.

*Reversed and remanded.*